In re Kenneth Wayne STROMBERG and Susan Marie Stromberg, Debtors.

Bankruptcy No. 91–16353 CEM.
MC No. RSS–1.

United States Bankruptcy Court,
D. Colorado.

Dec. 8, 1993.

R. Scott Schofield, Colorado Springs, CO, for debtors.

Sally Zeman, Denver, CO, Standing Chapter 13 Trustee.

## ORDER ALLOWING FEES

CHARLES E. MATHESON, Chief Judge.

This matter is before this Court following a remand of an appeal pertaining to the allowance of attorney's fees to R. Scott Scho-

field, Debtors' attorney ("Schofield" or "Applicant"). The Order of remand which entered on August 6, 1993, directed this Court to conduct a hearing on the reasonableness of the Applicant's fees and costs in this case.

Upon receipt of the Order, this Court reviewed pertinent authorities on the requirement of a "hearing" and determined that, under the circumstance of a noncontested fee application, the "hearing" requirement can be satisfied by providing the Applicant with an adequate opportunity to submit affidavits and argument in support of the fees requested. *Bee v. Greaves,* 910 F.2d 686 (10th Cir. 1990). Thus, a hearing in open court would not be necessary.

Having so concluded, this Court issued an Order For Hearing On Fee Application wherein Applicant was afforded 30 days within which to file "such affidavits and other evidence meeting the requirements of Fed. R.Civ.P. 56(e) as Applicant desire[d] to submit in support of the pending fee application together with a memorandum stating Applicant's arguments in support of the requested fee." On September 17, 1993, Applicant filed a "Chapter 13 Fee Application" ("Fee Application") supplemented by a document captioned "Filing of Fee Statement and Supporting Documents To Comply with Order of 18 August 1993" ("Filing"). Attached to that document were the following:

1. Motion For Reconsideration of Attorney Fees and Costs.

2. An article from Newsweek Magazine, September 20, 1993 titled, "Dumber Than We Thought, Literacy: A new study shows why we can't cope with every day life."

3. An article from Time, September 20, 1993, titled "Adding up the Under-Skilled."

4. A compilation of foreclosure fees and costs charged by other attorneys in connection with twelve (12) Chapter 7 clients of the Applicant.

5. An affidavit of Wilbur Frank Barlow.

6. Time Summary.

The Application requests allowance of fees in the amount of "$1,436.84 plus $500"[1] and

1. In the wherefore clause of the document cap-    tioned "Filing of Fee Statement and Supporting

expenses in the amount of $58.75, of which $650 has been paid. The attorney alleges in the Application that he has billed a total of: 16 hours at $120 per hour; 3.0 hours at $60 per hour; 6.0 hours of paralegal time at $45 per hour; and 1.5 hours of paralegal time at $25 per hour for "babysitting." These charges aggregate to a total of $2,407.50.

The Application filed substantially conforms to Local Bankruptcy Rule 216.2. That form, a rather simple form, became effective on July 1, 1993, with the advent of this Court's new local rules and is recommended for use at the time an initial Chapter 13 fee application is filed in the first instance, generally not later than fifteen days after the order of confirmation. In any event, one paragraph in the form solicits "a short statement of any unusual, troublesome or unique aspects of this case which resulted in more than the usual amount of time being expended." Applicant filled in the lines after that statement with the following: "Children at office visits, multiple office visits to explain details and responsibilities, information provided was supplied over time and was imperfect." In the "Filing" document, Applicant has averred that the Debtors needed extra explanation, that the Debtors did not deliver all the requested documentation at the first or second visit and counsel had to work from the documents which Debtors had prepared for Consumer Counseling Credit Service. All in all, Counsel attempts to justify a higher fee request because the Debtors did not promptly provide documents to him and they required extra time for explanation.

This is, by no means, this Court's first foray into the sometimes elusive standards for the allowance of fees in Chapter 13 cases. *See, In re Casull,* 139 B.R. 525 (Bankr. D.Colo.1992). While *Casull* remains applicable, the Court will, nonetheless, endeavor once again to articulate the basis upon which fees for debtor's counsel can properly be allowed in these cases.

## I. FACTS OF THE CASE

An evaluation of the fees in this case requires this Court to review the Debtors' financial picture from the eyes of an experienced consumer bankruptcy attorney at the time of the initial visits. These Debtors have less than a dozen creditors. Four of those are secured creditors and six are unsecured. The liabilities total approximately $43,000. Over half of that figure is debt owed to secured creditors. The unsecured debt is primarily credit card and short term personal/signature loans. There are no large medical or hospital bills or other evidence of an unusual or extraordinary event precipitating the Debtors' financial demise. In addition, the Debtors owed personal property taxes in a nominal amount which the Applicant has provided for as a priority creditor. On the other side of the balance sheet, the Debtors' assets total approximately $19,000 consisting primarily of a mobile home (in which they resided), two cars, stereo and TV and a waterbed, all of which partially secure the debts owed to the secured creditors. The Debtors' combined monthly income is approximately $1,480 or approximately $18,000 per year.

At the time of the filing, the Debtors were three months in arrears on the debts secured by the mobile home and one of two vehicles. They were one month in arrears on the debt secured by the second vehicle and on which the Debtors' parents are co-obligated. Debtors were eight and ten months in arrears on the debts secured by purchase money security interests in their stereo and TV and waterbed, respectively. These Debtors clearly "consumed" beyond their financial means and it is undoubtedly the arrearage on these

Documents to Comply with Order of 18 August 1993" Applicant requests $1,436.84 but also has included the following statement/request: "To the extent that the time value developed in the fee application exceeds the fees and costs noticed to all parties, the first $500 increment is requested to be awarded since Fed.R.B.P. 2002(a)(7) does not require additional notice to creditors. The additional sums should be awarded only to the extent that all specified creditors are paid sums as promised in the Plan." It is extremely difficult to understand exactly what Applicant intends. This Court presumes, however, that what Applicant seeks is the allowance of the full $1900 amount but hopes to avoid the need to "renotice" this application by dividing the amount into the $1400 figure previously noticed and a $500 amount which is the amount in the Rules after which notice must be given.

consumer goods which precipitated the filing of the case.

This case is a "no asset" case. The assets are either encumbered or exempt. If this were a Chapter 7 case, there would be nothing available to pay unsecured creditors and, in the Chapter 13, that becomes the measure of what the Debtors need to pay the unsecured creditors in order to meet the requirements of section 1325(a)(4) of the Code. Except for the Debtors' desire to retain, and pay for over time, their consumer goods, this case could have been filed as a Chapter 7. The advantage to the Debtors of a Chapter 13, however, is that because of the nature of some of their secured purchases, the Debtors could "cram down" the secured lenders to the value of their collateral and bring the payments into line with their ability to pay. That is exactly what the plan in this case proposed to do. No defaults were cured. Rather, with respect to each secured creditor, the Debtors proposed to pay them a fraction of the outstanding balance on the debts. For example, in the Plan originally filed, the Debtors valued their mobile home at $5,200, yet they owed the lender almost $12,000. They valued the stereo and TV in the aggregate at $1,300 and their waterbed at $150. The outstanding balances on each, however, were $4,100 and $1,700, respectively. In their Motion to Confirm, the Debtors attested that they believed the property had the values ascribed because they are: "reasonable resale values on open market." No real indication of the origins of their belief about the property values is offered.

The Plan proposed to pay the unsecured creditors, whose debt totaled approximately $17,500, only $500.00. Certainly such a payment would be acceptable within the parameters of 11 U.S.C. § 1325(a)(4) so long as the unsecured creditors receive at least what they would receive if the case were liquidated under Chapter 7. Because this is, as this Court has already observed, a no asset case, $500 exceeds the threshold of section 1325. The Plan also proposed to pay in full the undersecured portion of a debt owed to Ben-

eficial Colorado, Inc. ("Beneficial"), one of the creditors secured by one of the Debtors' vehicles, as a separate subclass of the unsecured creditors. One of the Debtors' parents had cosigned the note and the Debtors wanted to both keep the car, cram it down and protect the cosigners, their parents, a mechanism expressly countenanced by the Code. 11 U.S.C. § 1322(b)(1).

Two objections to the plan were filed. One was filed by the creditor whose loan was secured by the Debtors' mobile home. The other was filed by the Chapter 13 Trustee. Both objections were resolved without a hearing. Debtors' counsel does not mention this as an unusual aspect requiring any significant additional time in the case.

The Chapter 13 Trustee objected primarily to a novel provision[2] which the Applicant drafted to obviate the need for notice to all creditors in the event of a post-confirmation modification based on the Debtors' inability to make their regular payments. The provision was contrary to the established precedent of the bankruptcy court for this district and the notice requirements of the Code and the rules. *In re Hansen,* 125 B.R. 831 (Bankr.D.Colo.1991); 11 U.S.C. § 1329; Fed. R.B.P. 2002 and L.B.R. 202.

Ultimately, the Debtors capitulated and both objections were resolved without a hearing. Applicant modified the Plan by literally crossing out the offending provision and value. The Applicant then merely inserted the value which was determined by an appraisal done by the creditor. The value finally agreed upon was almost $2,000 more than the Debtors' asserted value.

As this Court has already observed, the Debtors valued the mobile home at less than half the balance due. In and of itself, that is not necessarily significant, but the overwhelming inference which can be drawn from the pleadings is that the value was rather arbitrarily drawn to fit within what the Debtors could afford rather than having any particular relationship to the actual value of the

---

**2.** The provision read: "After confirmation and during the life of the Plan, the Debtors may, upon petition and approval by the Court, alter up to 3 consecutive months Plan payments due to temporary income dislocation or adverse expense experience. No notice under In re Hansen will be given except to Chapter TTE."

property. Such is the reality of Chapter 13 practice.

Undoubtedly, objections to confirmation are among the factors to be considered in evaluating the fees to be awarded. In this case, however, the objections filed were prompted, at least in part, by the Applicant and, more importantly, were propounded and prosecuted for the benefit of the Debtors only. Clearly the estate derived no benefit from those skirmishes.

In summation, the problems presented from a legal perspective were not particularly challenging. This was not a complex or complicated case and Applicant does not allege that it was. The tools within Chapter 13 of which the Debtors could avail themselves, once the decision was made to file a Chapter 13, were to cramdown their secured lenders and discharge almost all their unsecured debt, other than to Beneficial. The only limitations or difficulties appeared to be the Debtors' ability to provide documentation and income to support a plan.

## II. GOVERNING LAW

This matter comes before the Court by reason of the provisions of section 1322(a)(2) of the Bankruptcy Code. Under that provision a debtor's Chapter 13 plan is required to provide for the payment of all claims for which priority is allowed pursuant to section 507 of the Code. Section 507(a)(1) requires administrative expenses which are allowed pursuant to section 503(b) to have first priority in payment out of the estate. Administrative expenses under section 503(b) include any fees allowed pursuant to section 330 of the Code.

Section 330 of the Code governs the allowance of fees to debtor's counsel who, in a Chapter 13, is employed by the debtor. That employment is not approved by the court. Section 330 provides, in pertinent part:

After notice to any parties in interest and to the United States Trustee and a hearing ... the court may award ... to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such ... attorney, as the case may be, and by any

paraprofessional persons employed by such ... attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

■ Under section 330 of the Code, the Court may award fees to debtor's counsel based on the "value of such services." This phrase has generally been interpreted to mean value to the estate. *In re Kendavis Industries Intern., Inc.,* 91 B.R. 742, 761 (Bankr.N.D.Tex.1988); *In re Jessee,* 77 B.R. 59 (Bankr.W.D.Va.1987); *In re TS Industries, Inc.,* 125 B.R. 638, 642 (Bankr.D.Utah 1991); *In re Reed,* 890 F.2d 104 (8th Cir. 1989); *In re Orthopaedic Technology, Inc.,* 97 B.R. 596 (Bankr.D.Colo.1989).

■ The Tenth Circuit has recently elaborated on the part "benefit" of the services plays in the analysis the court must conduct, at least in a Chapter 11 case. In *In re Lederman Enterprises, Inc.,* 997 F.2d 1321 (10th Cir.1993), the Tenth Circuit held that the question of whether the services performed conferred benefit on the estate is not merely a factor to be considered in deciding what would constitute a reasonable fee for attorney's services, but is a threshold question bearing on an attorney's eligibility for compensation. If the services do not provide a benefit, they are not to be compensated, regardless of the reasonableness of the amount sought. *Id.* Thus, any analysis of fees in the context of an award of fees under section 330 in a Chapter 11 case must begin with the threshold determination of whether benefit was conferred. If no benefit is conferred, then the Court need not conduct a "reasonableness" inquiry.

■ In the Chapter 13 arena, implementation of the *Lederman* rule requires consideration of factors different from those present in either Chapter 11 or Chapter 7. In Chapter 7 cases, unlike Chapter 13 cases, the services which debtor's counsel performs which benefit the estate can be fairly clearly articulated. A Chapter 7 debtor's attorney is

"entitled to compensation for analyzing the debtor's financial condition; rendering advice and assistance to the debtor in determining whether to file a petition in bankruptcy; the actual preparation and filing of the petition, schedules of assets and liabilities, and the statement of affairs; and representing the debtor at the Section 341 meeting of creditors." *In re Holden,* 101 B.R. 573, 576 (Bankr.N.D.Iowa 1989) citing *Matter of Olen,* 15 B.R. 750, 752 (Bankr.E.D.Mich.1981) (other citations omitted). These are services which assist the Debtor in the performance of his duties under the Code and aid in the administration of the estate. *In re Reed,* 890 F.2d 104 (8th Cir.1989) (relying on *In re Holden* ). By contrast, courts have rather uniformly denied debtors' attorneys' requests for the payment of fees out of the estate for representing debtors in dischargeability actions. *See, e.g., In re Reed,* 890 F.2d 104 (8th Cir.1989); *In re Holden,* 101 B.R. 573 (Bankr.N.D.Iowa 1989).

The activities for which a Chapter 7 debtor's counsel can be compensated out of the estate derive from the Chapter 7 debtor's duties prescribed in the Code. *See* 11 U.S.C. §§ 343 and 521. The same provisions apply to the Chapter 13 debtor, but the provisions of Chapter 13 of the Code contain additional mandates. The Chapter 13 debtor, like the Chapter 11 debtor, must file a plan and that plan shall

> provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan; provide for the full payment, in deferred cash payments, of all claims entitled to priority . . . , unless the holder of such claim agrees to a different treatment . . . and if the plan classifies claims, provide the same treatment for each claim within a particular class. 11 U.S.C. § 1322(a)(1), (2) and (3).

In addition, the debtor must commence making payments under that plan within 30 days after the plan is filed. 11 U.S.C. § 1326.

In the Chapter 11 context, courts routinely authorize compensation out of the estate for the services of debtor's counsel in seeking confirmation of a plan. Such fee allowances require, as the *Lederman* case makes clear, an analysis of the benefit to the estate from such services. In this regard courts frequently disallow fees when it appears that the debtor's attorney has become overzealous in promoting the debtor's self interest to the detriment of the "estate" and the creditors. *In re Kendavis Industries Intern., Inc.,* 91 B.R. at 761–762; *In re Office Products of America, Inc.,* 136 B.R. 983 (Bankr.W.D.Tex. 1992). Even in the Chapter 13 context, one court has observed that, when a plan provides for de minimis payment to unsecured creditors, fees to debtor's counsel should be limited because there is little benefit to the "estate." *In the Matter of Malewicki,* 142 B.R. 353, 357 (Bankr.D.Neb.1992).

■ In one important respect, Chapter 13 differs from both Chapters 7 and 11. In both 7 and 11, for the individual debtor, postpetition earnings are not part of the "estate." 11 U.S.C. § 541(a)(6); see also, *Patrick A. Casey, P.A. v. Hochman,* 963 F.2d 1347 (10th Cir.1992) (individual debtor's postpetition invention and patent were not property of the "estate.") Thus, the attorney's fees for such things as the defense of a dischargeability suit can, in theory at least, be paid out of the debtor's postpetition earnings. While any such fees remain subject to scrutiny by the court under 11 U.S.C. § 329, the payment of such fees out of the postpetition earnings does not diminish the "estate." Thus, such payment does not diminish the fund to which the creditors are entitled to look for payment.

■ By contrast, in Chapter 13 the postpetition earnings of the debtor *are* property of the estate. 11 U.S.C. § 1306(a)(2); *Calder v. Job (In re Calder),* 973 F.2d 862 (10th Cir.1992). Indeed, it is these earnings which must be available for an individual to even be able to file a Chapter 13 case. 11 U.S.C. § 109(e) ("Only an individual with regular income . . . may be a debtor under Chapter 13 of this title.") Further, the debtor must be prepared to contribute to the Chapter 13 plan all of the debtor's "net disposable income," as defined in 11 U.S.C. § 1325(b).

Even in Chapter 13 it is possible to envisage a scenario where debtor's counsel would

be paid from plan payments for services found by the Court to be beneficial to the "estate," and paid by the debtor out of post-petition earnings for those services which primarily assist the debtor in the realization of the benefits of filing a Chapter 13 case but which do not separately enrich the estate. However, in Chapter 13, unlike Chapters 7 and 11, this approach does little or nothing to protect the creditors because the fees paid outside the plan will almost certainly be deductible by the debtor as a budgeted expense item, thereby reducing the amount to be paid into the plan. Thus, in Chapter 13, the amount ultimately distributable to the creditors is going to be diminished by the cost of professional services, regardless of benefit to the estate.

■ The *Lederman* requirement of finding a benefit to the estate before professional fees can be allowed is not to be found in section 330 of the Code. The requirement is one imposed out of the judicial interpretation of what constitutes "necessary" services within the meaning of section 330. *In re Lederman Enterprises, Inc.,* 997 F.2d at 1323. Because Chapter 13 is different from Chapters 7 and 11 in the treatment of post-petition income, the Court concludes that the inquiry in allowing fees for debtor's counsel in Chapter 13 must extend beyond the narrow scope mandated by *Lederman* for Chapter 11. The question must extend, instead, to whether the services were "necessary" in order to. enable the debtor to perform the debtor's duties under the Code and to also enable the debtor to enjoy the benefits available in Chapter 13.

■ Beyond the question of whether the services were "necessary", the Tenth Circuit Court of Appeals has established a checklist of matters to be considered in awarding fees. In the case of *In re Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir.1981), the Court adopted the standards earlier set forth in *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir.1974). Those cases have established that in awarding fees in bankruptcy matters, the court should appropriately consider the following factors:

(1) the time and labor required;

(2) the novelty and difficulty of the questions;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation and ability of the attorneys;

(10) the undesirability of the case;

(11) the nature and length of the professional relationship with the client; and,

(12) awards in similar cases.

The United States Supreme Court, in an opinion rendered after *Permian Anchor,* revisited the fee arena in the case of *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). There again, that Court, relying on *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), affirmed the principle that in awarding fees a court should start with the "lodestar" established by applying a reasonable hourly rate to the reasonable number of hours required for the task.

In a particularly cogent opinion, *Mares v. Credit Bureau of Raton,* 801 F.2d 1197 (10th Cir.1986), the Tenth Circuit voiced the sentiment of the Supreme Court when it stated:

In reaching their determinations [regarding the allowance of fees] district courts must follow the guidelines established by the Supreme Court and this court. See, e.g., [*Pennsylvania v.* ] *Delaware Valley,* [478 U.S. 546] 106 S.Ct. 3088 [, 92 L.Ed.2d 439]; *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541 [, 79 L.Ed.2d 891]; *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933; *Ramos v. Lamm,* 713 F.2d 546. "[T]he benchmark for the awards under nearly all of ... [the statutes awarding fees] is that he attorney's fee must be 'reasonable.' " *Delaware Valley,* [478 U.S. at 560,] 106 S.Ct. at 3096. *Mares* 801 F.2d at 1201.

The lodestar figure [reasonable hours times reasonable rates] includes most, if not all, of the relevant factors comprising a 'reasonable' attorney's fee. *Delaware Valley,* [478 U.S. at 564,] 106 S.Ct. at 3098. Thus, the court's most careful labor must be concentrated on adjustments to claimed hours and rates in order to arrive at reasonable hours and rates. *Id.* 801 F.2d at 1201–1202.

■ All of this speaks to what a court must undertake and focus upon in its analysis, but the burden that is placed on counsel must not be forgotten. The Court in *Hensley* admonished that attorneys, in applying for fees, "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart,* 461 U.S. at 432–34, 103 S.Ct. at 1939–40. The Tenth Circuit Court of Appeals has similarly recognized that the actual time expended by the attorneys is not necessarily the reasonable time expended. In the private sector, "billing judgment" is an important component in fee setting which is no less important when the fees are to be set by the court. *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983). Not every hour or part of an hour spent by an attorney is "billable" and it is incumbent on the attorney to exercise "billing judgment" when submitting applications to the court.

■ In the context of Chapter 13 fee applications, the need for attorneys to exercise billing judgment is heightened. Similarly, because of the peculiarities of Chapter 13, court scrutiny of Chapter 13 fee applications, even in the absence of an objection by a creditor or the trustee, is critical. The debtors in Chapter 13 cases really have no interest in exerting any control or objecting to their attorneys' fees charged. *Accord, In re Copeland,* 154 B.R. 693 (Bankr.W.D.Mich. 1993). Debtors must contribute all "disposable income," as that is defined by the Code, to the plan. Payments to their attorneys and their creditors come out of that contribution and, regardless of to whom it is paid, the money, in either case, is unavailable to the debtors.

Certainly, the creditors in bankruptcy cases have a direct interest in objecting to the fees requested if they are unreasonable. To the extent the Court disallows certain of the attorneys' fees provided for in the plan, those monies would then be available to the unsecured creditors. As a practical matter, however, the creditor cannot afford to do so. Generally, the distribution to unsecured creditors is inconsequential and, even if the fees are reduced and more is available to the unsecured creditor class, the actual return to a particular creditor is only nominally increased. The absence of any incentive for debtors to monitor and object to the fees charged and the practical impediment to a creditor's objecting place the burden on counsel to exercise professional judgment and restraint.

■ There is another, more subtle, restraint that must be exercised by debtor's counsel in Chapter 13 cases. Clients, especially those with limited financial resources, who are aware that they are going to have to pay their attorney $2.00 for each minute they utilize the attorney's services have a natural reluctance to overutilize those services. Chapter 13 debtors have no such reluctance because their utilization of the attorney essentially costs them nothing more. Thus, it is easy for them to thrust onto the attorney all kinds of work which the debtors properly could accomplish, and to impose on counsel by repeated phone calls, office visits, etc. The attorney has a responsibility to deter this kind of activity, to impose restraints on the debtors, and to avoid the application of the "Peter Principle" whereby the "professional" services expand to absorb the pool of funds available.

■ In the final analysis, where it becomes obvious that the attorney has lost that sense of objectivity and restraint which enables him or her to subjectively set a reasonable fee for necessary professional services, the Court must endeavor to make the evaluation. In doing so, this Court must weigh the hours claimed against its own knowledge, experience and expertise of the time required to complete similar activities. *Johnson v.*

*Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir.1974). Consideration can, and must, be given to the range of factors enunciated in *Permian Anchor,* but the ultimate goal is to apply a reasonable hourly rate to a reasonable number of hours which should have been required to achieve the necessary results. *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Mares v. Credit Bureau of Raton,* 801 F.2d 1197 (10th Cir.1986). This is not, never has been, and can never be, a mechanical function, but will always remain a subjective search, not for perfection, not for the right fee, but to determine a *reasonable* fee. That is the standard which must guide this Court in reviewing the fee applications in this case.

▆ This Court is also guided in its review of the fees involved by the tempering language of the Tenth Circuit that, while the Court must articulate its reasons for any adjustments to fees, *Hensley v. Eckerhart,* and set out sufficient findings and conclusions so that an appellate court has an adequate record on review, *Ramos v. Lamm,* it is not necessary for this Court to identify and justify each hour allowed or disallowed. *Mares v. Credit Bureau of Raton,* 801 F.2d 1197, 1203 (10th Cir.1986). The Tenth Circuit explained:

> Our instructions to district courts regarding their evaluation of tasks, hours, rates and other matters, were never meant to cause a subtle shift in the burden of proof from counsel to the court. The burden is not for the court to justify each dollar or hour deducted from the total submitted by counsel. It remains counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero. In the process and especially in the end result, district courts must continue to be accorded wide latitude. *Id.* at 1210. *See also, Bratcher v. Bray–Doyle Independent School Dist. No. 42,* 8 F.3d 722 (10th Cir. 1993); *Zuchel v. City and County of Denver, Colorado,* 997 F.2d 730 (10th Cir.1993).

It cannot be understated, in applying for fees under 11 U.S.C. § 330, it is the obligation of the attorney to show the entitlement to fees. *Continental Illinois Bank & Trust Company*

*of Chicago v. Charles W. Wooten Ltd. (Matter of Evangeline Refining Co.),* 890 F.2d 1312 (5th Cir.1989); *see also, Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

## III. ANALYSIS

▆ The time which most obviously falls out in evaluating whether the services charged for were "necessary," and which is indicative of the unreasonable nature of Applicant's request overall, is the time charged for BABYSITTING. The Applicant has charged the estate at $25 per hour for 1.5 hours of time. (See entries for 5–2–91 and 5–7–91). Applicant has not proffered any argument in the narrative of his fee application as to why such "fee" ought to be allowed. Instead, Applicant argues his position in his time records for the entry for 5–2–91. He writes: "PL had to 'babysit' [the Debtors' children] so atty. could conduct a 'professional' o.v. without constant interruptions by children. PL's time which should have been devoted to other tasks was basically lost so as to make best use of atty. time." (See entry 5–21–91.) This service, not legal in nature, is neither professional, necessary nor reasonable. It is a prime example of the attorney failing to exert any restraint on the Debtors' utilization of his office. The Court can well imagine the Debtors' outrage had they been told that they would be charged $25 per hour for child supervision when the family came to the attorney's office.

Applicant apparently seeks allowance of fees in the total amount of $1,936.84, although he has billed a total of approximately $2,400.00. He also requests reimbursement of costs in the amount of $58.75. Applicant was paid $650 prior to the commencement of the case. Thus, he seeks a balance of $1,286.84 plus costs of $58.75 for a total of $1,345.59 to be paid through the Chapter 13 Plan. This Court had originally allowed Applicant a total for fees and costs of $1,130 leaving a balance due of $480 to be paid through the Chapter 13 plan. After rereviewing all the materials provided, including the affidavit and the billing sheets, this Court concludes that the fee awarded back in 1991

in the first instance is the reasonable fee to be allowed in this case.

As observed earlier in this opinion, this case is a relatively simple case and what is most remarkable and what pervades is this Applicant's singular inability or unwillingness to exercise any billing judgment. Applicant has been both flagrant and deliberate in charging the estate and his clients $25 per hour for babysitting.

Applicant also has a propensity for charging at his full hourly rate for every minute spent related to a client regardless of the nature of the time expended. For example, the attorney has spent substantial amounts of time explaining or reexplaining information previously provided, which demonstrates his unwillingness to impose any restraints on his clients in their use of his services. (See entries: 4–18–91; 4–29–91; 5–2–91; 5–7–91). Some of the services which are billed are purely clerical in nature and should not be charged to the estate at all. (See entries: 9–18–91; 10–19–91 [two entries]; 9–20–91 and 10–10–91). For example, Applicant has billed for phone calls with opposing counsel which appear to involve nothing more than transmittal of information such as: "the appraisal has been done, I'll forward a copy;" (see 9–18–91); or for incoming phone calls from the client accepting the creditor's appraisal (9–19–91); or for leaving a message with opposing counsel that his clients accept the appraisal (9–19–91). (See also entry for 9–20–91). Other services, which may be considered "professional" but are not of the degree or nature that warrant Applicant's maximum hourly rate, have been billed at counsel's full hourly rate of $120 per hour. (See entries: 5–2–91; 5–7–91; 5–8–91; 9–18–91; 10–10–91 (two entries); 10–17–91). As an example, after Applicant had already spent over two hours with the Debtors explaining and reexplaining, he billed another .8 of an hour for an unexplained office visit (5–2–91). Within a week of that meeting, he made some change to the plan and billed another .7 of an hour for yet another meeting with the Debtors "to review the redrafted plan" (5–7–91). It appears that this time has been spent "handholding," reassuring, or reexplaining and that time is simply not com-

pensable at $120 per hour. As another example, counsel has billed his time reviewing "withdrawals" of objections at his full hourly rate. The withdrawal of objection is, as a general matter, perfunctory and does not involve any analysis or time (10–10–91; 10–17–91).

It is also noteworthy that Applicant has billed three hours of time for preparation of this fee application. Although he has billed that at one-half his hourly rate, there are no time entries which support such an expenditure of time. The only time entry relating to fees is a half hour entry for drafting the motion to reconsider and drafting "Cost/Benefit Statement" and that time has been billed at his full hourly rate. (See entry 10–30–91). Regardless, there is nothing which bolsters his assertion that three hours of time was spent and this Court fails to see how the application submitted could have consumed that much time.

Another factor of which the Court is mindful is the "form" nature of Chapter 13 practice. The petition, proofs of claim, plan, plan analysis, motion to confirm, notice of hearing and order are all standardized forms. Once the attorney has determined that a Chapter 13 is appropriate and the shape the plan will take, the work which follows entails minimal "drafting." Yet, the Applicant has billed excessive amounts of time for drafting, review and revisions. (See entries: 5–7–91; 5–9–91; 5–10–91; 5–16–91; 6–22–91; 6–24–91; 9–18–91; 9–20–91; 10–1–91). In addition, what this file reflects is that the Applicant, when he revises a document, simply copies the document previously filed, crosses out the pertinent provision, inserts the change and writes or types in the new provision on the copy. He then files that document with a second signature and current date.

Finally, what cannot be ignored as a measure of reasonableness is what other attorneys charge in comparable cases. Applicant has billed and requested, in this and his other cases, amounts which grossly exceed the amounts requested by other experienced attorneys who, like the Applicant, practice regularly in the Chapter 13 arena. At the time this case was filed, and currently for that matter, the fees requested by practition-

ers for cases of comparable complexity range from $800 to $1,200. Applicant's request for just over $1,900 is unwarranted and unsupported by the application before the Court. Even the information which he has submitted as evidence of the cost of comparable services outside bankruptcy more than supports this Court's conclusion. Applicant has tendered Exhibit K as evidence of the "cost of comparable services other than a case under" title 11, a standard of section 330 to be considered by the court when awarding fees in a bankruptcy case. Exhibit K is a list of 12 clients of the Applicant. Each client was involved in a foreclosure prior to the filing of the bankruptcy case and a motion for relief from stay once the bankruptcy case was filed. The range of fees charged by the foreclosing creditors is between $550 to a high of $2,500. The average fee charged, however, is $1,145. This average factors in one extraordinary case which involved foreclosure fees of $2,500. Without that one $2,500 charge, the average cost, of what Applicant has propounded as comparable matters, is $895.00, a number which is more representative. In any event, the fee which Applicant seeks in this case grossly exceeds what he would offer as a comparable fee.

With respect to paralegal time other than what has been charged for babysitting, the same problem surfaces. Applicant has exercised no judgment in the billing of her time. Many of the entries billed are for clerical tasks such as relaying messages from the clients or creditors or coordinating the appraisal. (See entries 5–10–91; 6–21–91; 6–24–91; 8–26–91; 8–27–91 (2 entries); 8–29–91; 9–11–91; 9–13–91; 9–18–91). These tasks are not compensable as "professional" time. *In re Casull*, 139 B.R. 525 (Bankr. D.Colo.1992); *In re Orthopaedic Technology, Inc.*, 97 B.R. 596 (Bankr.D.Colo.1989). In addition, all paralegal time has been billed at the same hourly rate of $40 per hour, the high end of what is considered a reasonable hourly rate. Applicant has offered no evidence of his paralegal training or experience to support such an hourly rate. Moreover, even if the rate is justified, some of those services charged do not warrant such an

hourly rate or involve both clerical (noncompensable) and paraprofessional (compensable) services and the precise amount of time spent on each cannot be broken out. Accordingly, such time should also be disallowed. (See entries: 5–8–91; 5–16–91; 6–14–91; 7–12–91; 10–3–91).

## IV. CONCLUSION

In the final analysis, this attorney has charged an unreasonable fee in this case in light of the nature of the case and the simplicity of the legal issues involved. Applicant has failed to exercise billing judgment and has charged the estate for services such as babysitting which demonstrate a lack of judgment and disregard for the creditors of this estate. Applicant also failed to impose any restraints on the Debtors' use of his time and services. Indeed, Applicant's fee application states, as the primary reason for the higher fee, the "multiple office visits to explain details and responsibilities, [and] information provided was supplied over time and was imperfect." This is a no asset estate in which the creditors will receive a pittance while the attorney attempts to reap the benefits of whatever excess the Debtors have available after making payment to their lenders secured, for the most part, by luxury consumer goods. While this Court is not unmindful of the thresholds of the Code and the attorney's entitlement to fees, at the expense of creditors, this is not the case which justifies such a disproportionate award. Accordingly, Applicant is allowed a total fee of $1,130.00 and expenses in the amount of $59.00,[3] of which $650.00 has been paid, leaving a balance due of $539.00 to be paid through the Chapter 13 Plan.

---

3. This Court's earlier allowance in this case included both fees and costs. This Court hereby separately allows the costs expended based upon the supporting documents provided.